U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

AU'   7 '' 2012

'.WRENCE !. B..ERMAN, CLER'
B..NY

U.S. District Court
Northern Dist. of NY{ss

---

Jeffrey A Kelly, Plaintiff(*pro se' indigent)*

(File No.: **12 -CV- 1344** (MAD(RFT)

V.

Ulster County, NY:Defendant A
Health Alliance of the Hudson Valley, Inc.:
Defendant B

---

This is a Civil Rights action under 42 U.S.C.
Sec. 1983 involving involuntary commitment:
Prior filing(status:dismissed):# 1:10-CV-1118
(i.e., "federal qui tam").

---

## WHEREAS:

Def. A., in and through employees Pat

Gilcrest and Joe Ausanio(the latter a former

employee of Def. B in a similar role and a re-

*-1-*

tired member of the NY Yankees baseball org-

anization), effected a pickup order, faxed to

Kingston Police Dept. on June 3, 2010;

Def. A failed to adhere to recent case law

regarding standards set forth below therein

in properly evaluating Plaintiff for such an

act;

Def. A. had been confronted, while Plaintiff

was a client with its mental health dept.,

with a family estate issue upon which very

recently prior to the effectuation of said

commitment order it had reacted in highly

negative fashion toward Plaintiff;

Def. A, at no time prior to the issuance of
its civil commitment order to the local police
dept., effected a personal examination of
plaintiff for what it claimed was the basis
of effectuation of said civil commitment order,
and did so recklessly and without regard to
meeting the requirements of state statutes,
state case, federal case, statutory, and con-
stitutional law with regard to same;

Def. A, in reviewing one written sentence
rendered by the plaintiff to it, in complete
disregard of the remainder of the body of the
letter thereto attached and the issues of fact

-3-

discussed therein, issued the involuntary com-

mitment order, most likely in so doing, ans-

wering the apparent call of employment de-

mands in the field according more to the state

policy demands as a "mandatory reporter" un-

der state OMH policy(and resultant sanctions or

job loss for not doing so) than in adhering to the

law with regard to proper effectuation of in-

voluntary commitment;Def. B. had assigned

Eric Nies,MD, as the on-call ER mental health

physician to evaluate Plaintiff, who failed to

properly evaluate Plaintiff on the allegation of

an alleged threat made on the life of the

Mayor and who instead referred the

matter to the mental health evaluator;

Said mental health evaluator, G. M.

Smith, held Plaintiff for several hours

while he evaluated at least one other

patient for admission and twisted the

statement given to him about a blog

exchange between Plaintiff and the

Mayor to mean entirely something other

than what was told him and to indicate

in deliberate, reckless, and unethical

fashion, that Plaintiff presented a clear

and present danger to the Mayor;

Said G. M. Smith entered same into the

hospital record, and this was repeated

down the line in the hospital record in

order to substantiate for insurance purposes

the basis upon which Plaintiff was being held

involuntarily and his Medicaid was billed;

Said G. M. Smith, when informed of the exis-

tence of a blog exchange between plaintiff and

then-Mayor Sottile of Kingston, demurred on

the invitation for him to examine this exchange

by stating:"I'm not very familiar with the inter-

net and these things";thus, neither he nor any

other hospital staff examined the blog exchange

nor rendered any report if they did at any time

in the hospital record with respect to their

finding on this point; the attending Psychiatrist,

R. Ackerman-Raphael, made statements try-

ing to put forward the notion that either the blog

never existed or that the person representing

himself to be the Mayor on the blog was in

fact, not the Mayor(Dr. Ackerman-Raphael

never examined the blog entries to try to

render any determination on this point either);

Def. B, in and through its employee Psychiatrist

Diana Puglisi, MD, then proceeded to effect

the commitment through the process of Mr.

Smith(said mental health evaluator at Kingston

Hospital campus of the HAHV, Inc.)by

contacting her by phone whereupon she

approved same having accepted whatever

Mr. Smith told her as sufficient to properly

effect said commitment;Def. B, in and through

its employee Psychiatrist Rebecca Ackerman-

Raphael, proceeded to avoid NY MHY 9.39 in

that the "two p.c." rule was deliberately avoided

by her and she failed to consult with Plaintiff

until June 8, 2010; Same Psychiatrist fudged

the dates in the record, predating these to make

it appear as if such consultation had occurred

earlier; Def. B, in and through its employee Psychiatrist Carlos Valle, in a paper dated on a Sunday (June 6, 2012) on the same day the attending Psychiatrist, Rebecca Ackerman-Raphael, had filed into the record a legal status change of Plaintiff from "involuntary" to "informal", reversed this decision on OMH form falsely(a criminally chargeable act) averring on said OMH form that he had personally examined Plaintiff when in fact he did no such thing, and in doing so only repeated the falsehood of the mental health evaluator, G. M. Smith, in this regard; Def. B, in and through its hospital staff,

notably Nurse Vittarius, prevented Plaintiff

from due process of his Constitutional and

Civil rights by falsely stating to Plaintiff that

Plaintiff was prevented from immediately

asking for a court hearing by "the 72-hour

hold"; Def. B., in and through its Benedictine

hospital staff members Holly Ellison and Beth

Howard,falsified the hospital record with re-

spect to the Plaintiff's supposed violence-

proneness,by Ms. Ellison falsely stating there-

in that Plaintiff "lunged" at her while she was

questioning Plaintiff about "hospitalization

history", and in so doing violated Plaintiff's

(U.S. Constitution, Amend. 5) civil right to

protect himself against self-incrimination and

and committed professional and criminal fraud

in said act, while Beth Howard, as the Social

Worker, sat passively while this happened, not

once uttering a *single word* to Plaintiff(or

having *any interaction with Plaintiff whatso-*

*ever)* while he was a patient during the ref-

erenced time frame herein;

Def. B, in and through an activities employee,

stated about Plaintiff

that he was "not ready for activities"(while the

attending Psychiatrist had already stated in

the hospital record directly to the contrary)

,thus revealing a deliberate, reckless, and pu-

nitive policy which further disregarded Plaintiff's

civil rights in wholesale fashion, while using

as a motive for this the reckless and arbitrary

efforts employed generally as described

herein to bilk public health insurance programs

(a subject of significant prior litigation involving

Benedictine Hospital started by others);

Def. B., in and through its policy of ordering

medications, violated the Plaintiff's rights with

respect to be free from same unless he poses

a clear and convincing immediate danger to

himself or others (as decided in *Rivers v. Katz*);

Def. B. never related any information to Plaintiff with respect to what Plaintiff was being accused of doing to properly have the authorities effectuate(since he was unaware he had done anything to accomplish this, had to contact a local newspaper reporter to work on this issue, which did go forth and a story in the local newspaper was produced as a result which was published only AFTER Plaintiff was released by the hospital);Neither Def. A. nor Def. B ever properly evaluated Plaintiff toward effecting a

core determination of whether he was in fact a

danger to himself or others but instead only

used the circumstances to bilk Plaintiff's public

health insurance and milk same for all it was

worth, falsifying key elements of any fair e-

valuation toward achieving an evaluation of

same; That Plaintiff has no prior history of

*any* violent act *or* criminal act;

**WHEREFORE**  Defendants A and B are in

violation of state statutes under which their em-

ployee Psychiatrists have been previously in

the federal system deemed state actors under

Rubenstein v. Benedictine Hospital(790 F.

- /4 -

Supp. 396:N.D.N.Y., 1992) acting under color
of state law (MHY 9.39, effectuated the wholesale
abrogation of Plaintiff's Federal civil rights with
respect to U.S. Const.: Article 1, Sec. 9;Amend-
ments:1(speech), 4(search and seizure);5(self-
incrimination);8(cruel and unusual punishment);
14(due process:substantive) and further did so
without regard for making any real attempt to e-
valuate the Plaintiff in terms of his threat to the
public or to Mr. Sottile as an ostensibly "mentally
ill individual" or lack thereof, as the state interests,
under the legal theory of *parens patriae("the state
as parent")*
underpins the philosophical need for involuntary

commitment laws and process at the state level; thus, neither Def. A. nor Def. B. acted to adequately affirmatively protect the public either in the entire process described herein(thus underscoring the fact of this entire involuntary commitment process as a "sham" on every level it is designed to in theory *avoid* being a "sham"), thus committing false imprisonment while denying Plaintiff basic right to know what specifically it was that effectuated the involuntary commitment and thus giving him a fair chance to reply thereto "in adequate and proper specifics related to the specifics of any allegation against him"(either on a therapeutic basis or a legally exculpatory basis);

rather,the entirety of the involuntary commitment

process is designed to affirmatively deny anyone

who enters thereinto any right to effectively chal-

lenge anything placed into the record that is de-

signed to indict his ability to control his own actions

upon an allegation of "mental illness" or "history of

mental illness" and to argue and affirm that it is ne-

cessarily true or valid that prior involuntary com-

mitment is an adequate basis to indict a person for

present issues involving involuntary commitment

(the inpatient mental health system continues to

operate upon this premise even as the federal courts

have, to date, increasingly denied the "inpatient

mental health system" a legal basis upon which to

do so).[The usual arbitrary, capricious, and bias in

process toward financially serving the interests of

the hospital specifics of machinations used routinely

and carelessly by the involuntary commitment pro-

cess is on display in the instant complaint]. Also.

that as of June 6,2010, since the director's cancel-

lation order violated the criminal fraud statutes with

respect to the filing of a false instrument, Plaintiff

was legally, as of the order effected by the at-

tending Physician Ackerman-Raphael, under in-

formal status, and thus should have been per-

mitted to leave the hospital at any time(but

was denied that opportunity,and in fact was

never informed of the existence of

the change to informal status order until he obtained

the hospital record following his discharge on June

10, 2010 some weeks thereafter), and thus under

state statute,(N.Y.C.R.R. Title 14, Sections 27.8

and 27.9)was entitled to full protections of

procedures under said state statute to be taken

under objection to treatment, which Plaintiff was

denied and patient never informed of such pro-

cedures by notice of state statute pertaining to

same in any form while under a wholesale cur-

tailment of liberty upon the locked hospital ward.

## Jurisdiction and Venue

Both Def. A and Def. B do business in Kingston, NY;

Kingston, NY is within the Northern District of NY,

Statutes: Americans With Disabilities Act of 1990

(see *Olmstead v. L.C. below*)

## Narrative Legal Basis for Proper Action Before The Court

The action herein must meet the following standards, per

prior standards regarding legal concepts of federal

rules and procedures adopted for like cases under

42 U.S.C. Sec. 1983(and related through prior ex-

perience of Plaintiff in the instant federal district

court), to wit:

1)state actors acting under color of state law;

2)citation of what said state laws are that were

acted under/operant by defendants;

3)citation of what federal laws were violated.

therefore the correct venue is within the Northern Dist. of NY.

## Causes of Action:"Violation of U.S. Constitution"

1. Article 1, Sec. 9

(right of habeus corpus not to be suspended);

2. Amendment 1(speech: here, political speech)

3. Amendment 5(prohibition against requiring self-incrimination)

4. Amendment 4(unreasonable search and seizure);

5. Amendment 8(cruel and unusual punishment);

6. Amendment 14

(substantive due process);

-21-

Thus, construction of the complaint herein ac-

cording to all three said criteria is as follows:

a)State actors(under *Rubenstein v. Benedictine*

*Hospital*):Psychiatrists: Diana Puglisi, MD;

Rebecca Ackerman-Raphael, MD; and Carlos

Valle, MD;b)state laws under which state actors

acted: MHL 9.39(standards required for involun-

tary commitment and procedures and time frames

governing what is "supposed" to be carried out in

terms of timely and proper evaluation of the patient:

MHL 9.41(powers and legal immunities of police

related to involuntary commitment orders and pro-

cedures);MHL 33.16(state version of "habeus cor-

pus");MHL 33.03(b)(3)("based on appropriate

examination");and state case law:

*Rivers v. Katz/Grassi v. Accrish(495 N.E.*

*2d 337)(right to refuse medication);Brown v. NYC*

*Health and Hospitals Corp.(225 A.D. 2d 36:2nd*

*Dept., 1997)(high thresshold required for involunt-*

*ary commitment to become valid upon an eval-*

*uation that any person is "mentally ill" alone);In*

*The Matter of Michelle B.(215 A.D. 2d 475,627*

*NYS 2d 575(2nd Dept., 1995)(appellate div.vacated*

*order to administer forced medication via naso-*

*gastric tubes);*

c)Citation of federal laws that were violated:

1)see causes of action above **and** 2)federal

case law of:

a)*O'Connor v. Donaldson*(422 U.S. 563, 575-6, 1975);

b)*Addington v. Texas*(441 U.S. 418,1979);

c)*Rubenstein v. Benedictine Hospital*(790 F. Supp. 396:N.D.N.Y., 1992)

d)*Rennie v. Klein(*462 F. Supp. 1131[D.N.J.,1978]);

e)*Foucha v. Louisiana(*504 U.S. 71, 1992);

f)*Olmstead v. L.C.(*527 U.S. 581, 1999);

g)*Rodriguez v. City of New York(*72 F. 3d, 1051: 2d Cir. , 1995);

h)*Bolmer v. Oliveira(*570 F. Supp. 2d, 301, 317 :D.Conn., 2008);

i)*Olivier v. Robert L. Yeagher Mental Health Center (*F. 3d 183 , 191-92, :2d Cir. 2005);

j)*Johnson v. Glick(*481 F. 2d 1028, 1033:2d

Cir., 1973);

k)Goetz v. Crosson(967 F. 2d. 29,2d Cir.,

1992;41 F. 3d. 800(2d. Cir., 1994), cert.

denied, 516 U.S. 821, (1995);

l)*In Re Gault (387 U.S. 1, 1967);*

m)*Lessard v. Schmidt, (*349 F. Supp. 1078,-Dist.

Court, ED Wisconsin, 1972):

n)*Project Release v. Prevost(*722 F. 2d, 960-Court

of Appeals, 2nd Cir., 1983)

o)*Doremus v. Farrell(*407 F. Supp 509:1975):

p)*Lynch v. Baxley(*396 F. Supp. at 392-4);

q)*Dixon v. Attorney General of Pennsylvania*

(325 F. Supp. 966.974[M.D.Pa., 1971])

# Assertion for Status Of Prior Filing To Be Deemed

## "Unrelated"

Per (local rule) Gen. Order # 12 (G) (5), due to the

fact the prior filing was dismissed for lack of attorney

representation as required by then relatively recent

federal case law requiring same, the Plaintiff af-

firmatively, upon a general issue of "apparent prac-

ticality," asserts "unrelatedness" of the prior

filing to the current complaint;accordingly, in def-

erence to affirmative recognition of the local rule

cited hereinabove pertaining to the general issue

of "relatedness" (or lack thereof) of the prior

complaint to the instant/current complaint. This

assertion is made with the full realization that
both such complaints relate to the same event
and issues proixmately but do not relate "in prac-
tice" to each other vis-a-vis the dismissal of the
prior complaint upon what can be "reasonably de-
scribed as a 'technicality'" that appears to have
weighted process of same in favor of the
respondents, clearly over and above that of the re-
lator in the practical effectuation of an outcome that
was generally against the interests of justice gen-
erally(from both the standpoint of public health in-
surance fraud and revelation and discussion of the
issues that would have been relevant to the instant
complaint "*if* only these *had* seen the clash of legal

argument and debate"----but because such a
scenario never happened under the prior complaint,
it is asserted at this juncture that there was never
any vital discussion, debate, or legal clash between
the opposing positions at either deposition or trial
of any issue related to the instant complaint and thus
"for all intents and purposes the issue of the prior
filing should at this stage, be deemed 'moot' ");and
(and "perhaps moreover")that the prior complaint
was sufficiently at odds in the legal framework there-
of in that the core legal issue under that was
whether the respondents had committed Medicaid
Fraud pursuant to federal law pertaining to same

under a federal legal concept that first was passed

during the Civil War Era when the purchase of war

materials were used to defraud the government

and the federal government thus deemed it nec-

essary to have a mechanism to address this

practice of business transactions that resulted

in said defrauding of the federal government;con-

temporaneously, the general operation of the

healthcare system in the nation carries with it a

similar general propensity to defraud the govern-

ment and other insurance entities as well, ren-

dering the current national debate on how to man-

age this situation a general outcome related to

such issues as defrauding the government via

Medicaid and Medicare.  However, as a practical

legal matter, in terms of the issue of insurance

fraud is completely unrelated as a legal concept

to that of civil and human rights law, and as

such, it is asserted that any possible claim by the

opposing side of  "relatedness"(of the prior filing to

the instant filing) should fail upon this instant

legal unrelatedness alone, as it is said in the Latin

(adopted in Geography to denote opposite parts of

the earth), that the relationship of the two are "*anti-*

*podes";* that is to say, that the legal basis of the

prior filing is "so unlike that of the instant filing that

there appears to be no sufficient legal basis for af-

firming these two filing under discussion are, in the

applicable legal constructions,"related to *each other*

*with any sufficiency within the said legal con-*

*structs*." Thus, any notion that the prior filing

should, in any way, shape, or form, carry over to

the instant filing,is asserted upon the instantly-

aforesaid legal and practical facts and foundations,

as "invalid as process." Relatedly in this discussion,

while it is lamentable per legal process that the

government has taken a passive and somewhat

even hostile policy related to assisting in the pro-

secution of federal complaints under the *False*

*Claims Act* in any notable effort to combat public

health insurance fraud in the contemporaneous

healthcare system mess we experience generally

today, it remains a fact that the two legal concepts

involved in th prior complaint and the instant com-

plaint "are not even related as to being 'distant

cousins'."

## Demand For Trial

Plaintiff demands trial by: **JURY.**

## Overview of Legal Framework Of Issues

In the process of Involuntary Commitment, the

Federal Courts have formally recognized that such

a process represents "a massive curtailment of lib-

erty";the state is given the power of "parens patriae"

as a right to protect the interests of, in this case,

those deemed, "mentally ill", and those of society

at large from an ostensible threat(albeit a "class-

based unproven/disproven one" based on the o-

pinions of the majority of those employed in the

mental health field);the media are only interested

in reporting the angle of "crazed individual does X"

(whether or not there are any other angles of leg-

itimate interest to any story);against this backdrop

is a system designed to systematically to abridge

civil and many human rights afforded citizens of the

United States of America by deliberately, affirma-

tively,and routinely disregarding those rights con-

tained in the U.S. Constitution, The Declaration

of Independence by extension, and the precepts

of what constitutes "torture" around the world as

expressed in the Universal Declaration on Human

Rights and the Affirmations thereon of The Special

Rapporteur of the United Nations, of which the

United States is both a member and host state.

The motive for accomplishing this behavior on a

routine basis is simple and irresistable:financial

benefit to the Pharmaceutical, Hospital, and hos-

pital inpatient mental health worker community;

the means by which this is accomplished is over-

whelmingly statistically upon the fact that the e-

conomically disadvantaged are targeted much

moreso than others, in large part because Med-

icaid fails to deny insurance payments

for repeated involuntary commitments, and hos-

pitals routinely try to effect their legal power, once

a patient is so committed,to effect forced drugging

and other methods to achieve the substantial fi-

nancial benefits they now and continually enjoy in

this field. Since Plaintiff in this case is financially

disadvantaged, he is an easy target for the types

of abuse seen in this case and which routinely

occurs across the United States of America on a

daily basis. Once involuntary commitment is ach-

ieved against any individual, for all intents and

purposes, all rights of that individual terminate as

a member of society as had previously been

granted that individual, even though certain pro-

visions in the law dictate otherwise. No patient is

given adequate notice of their rights in the hospital

except to a lawyer employed by the state mental

hygiene legal services,and that person is generally

overburdened by a large case load from the habit-

uation of sham involuntary commitment processes

and thus tends to take little interest in any minutaie

(legal or otherwise) of the patient's issues with re-

spect to his or her claims, and is only interested

and involved in the patient's right to a court hearing.

which, if the hospital so designs, can render this

very easily yet another sham, and often does, to

its own financial benefit.   As an interesting over-

view in International Law--which the lawsuit herein

seeks to continue into such realm if necessary--is

that as the United States continues its vociferous

refrain in taking other nations to task in both his

Hemisphere and in the Eastern Hemisphere, it

tends to pay little to no attention to the cries of

those illicitly and in sham fashion detained on a

routine basis within the United States. This is a

situation of obvious hypocrisy;and while it can be

argued that the level and type of human rights

abuses in other nations tend to be of a more severe

nature than what is seen in the United States,

generally speaking, this nevertheless remains

an hypocrisy of public policy of some note.

Finally, Psychiatry is formally considered a form of

"medicine", and individuals who practice same are

required to have education in medicine of the same

fundamental type that other physicians acquire;how-

ever, while other forms of medicine rely at least in

part on science(some indict the "medical model" as

being overly simplistic), Psychiatry only relies upon

its own definitions, theories, and instincts, and is the

only branch of "medicine" which operates wholly

contrary to the Hippocratic Oath("First Do No

Harm") by knowing the dangerous of the treatments

it prescribes yet engages in them routinely anyway

and that forces upon people its "treatments"(under

another unproven and harmful theory that "every

single patient does not know they are ill"(the term

this branch of Witchcraft conjures up for this assertion is "Agonosia") Further, it is entirely devoid of science by being devoid of the use of the scientific method in adequate measure to properly meet the definition of adhering to the scientific method in diagnosis, treatment, and assessment.

Since it has also engaged the law in the upholding of its witchcraft as a valid part of the legal process, it has also entered thereinto and has inevitably perverted much of the fundamental underpinnings of what the law had theretofore held as valid. Against this level of power, we find no force adequate to meet this "steamroller" with sufficient counterforce of law, and as such this "Witchcraft

-39-

continues to enforce a circular reasoning

of some magnitude upon the government, the

populace, and society as a whole. It is thought the

Founders of the United States would have seen

such a development as ominous, and those who

participate in the extant vigorous campaign to op-

pose this tyranny, including petitioner herein who

will be doing so long after the instant complaint

sees disposition, are reasonably described as

in the midst of the battle for the civil rights of a

labelled, abused, oppressed, discriminated against,

and by circular reasoning often "limited for life" in

their lives by such a process, that is certainly

among the most recent great civil rights battles to

be waged in these United States.

As seen herein, certain federal case law has re-

cognized that very often state laws governing invol-

untary commitment processes and procedures are.

in and of themselves, inadequate to enforce the civil

and human rights of those civilly committed;more-

over, the routineness of such sham processes of

civil commitment continually involve routine abridge-

ments of the provisions of state laws designed to

govern and proscribe the rules under which civil

commitments occur(as the instant complaint

asserts occurred here).  Within the context of

a generally recognized situation of the United

States being the most densely per capita in-

carcerated industrialized society on earth, the

question is asked herein:"Does _**anything**_, in

_**this**_ context,_**'shock the conscience'**_?  and,

"Is it possible to 'shock the conscience' with

anything other than the routinely oppressive

processes of sham civil commitments of the

poor/disempowered?"

  [It is hoped this case will prompt some attempt

to, if not answer, these questions, and

asserted that the above references to human

rights in international law are _**necessary**_ as

plaintiff _**anticipates**_ this case _**will**_ see through to

the process of referral to the Organization of A-

merican States for Human Rights Violations

Review, to which the United States is a "state

party"]

## Litigant Contact List

Plaintiff:  Jeffrey A. Kelly
            164 Colonial Drive
            Kingston, NY 12401
            (845) 853-4963
            (endrun1111@hotmail.com)
====================================

Def. A :Ms. Bea Havranek, Ulster County Attorney
            Ulster County Office Bldg.,
            Main and Fair Streets

            Kingston, NY 12401
            (845) 340-3000
(Atty.:TBA)

Def. B :1) Mr. David Lundquist, CEO
            Health Alliance of the Hudson Valley, Inc.
            Kingston Hospital Campus

396 Broadway
Kingston, NY 12401
(845-331-3131)
1)a) Benedictine Hospital campus

105 Mary's Avenue
Kingston, NY 12401

(845) 338-2500
(Atty:TBA)

===============================

Prayer for Relief

For the damages of injuries to the plaintiff's psyche

with respect to a post traumatic stress syndrome

related to his forced incarceration as a reminder of

what he encountered in the mental health system

first at the age of 11:

Against Def. A and B:52 weeks per year at a cost

of $200 per week for Psychological Counseling to

-44-

a Psychologist, times 20 years = $10,400(times two = $20,800);

For punitive damages related to the reckless disregard for the plaintiff in his involuntary civil incarceration and affirmative attitude of dis-empowerment of him by all hospital staff in-cluding the obvious collusion with the disem-powerment schemata of all other hospital staff of the Social Worker assigned to him during this procedure:$100,800 for Def. B;

For punitive damages due to the abject and reckless disregard for plaintiff's federal civil rights by law by employees of Def. A.:$100,

800;bringing a total for all damages sought

equal to **$321,399** ;*declaratory and injunc-*

*tive relief (under Doremus v. Farrell) barring*

*the application of any similar arbitrary reck-*

*less acts by the Defendants in the future*

*against Plaintiff and affirming the issues*

*presented herein represented excessive*

*arbitrary acts in reckless disregard of the*

*facts pertinent to the issues raised by Def.*

*A in effecting the involuntary commitment*

*order and the guidelines already established*

*by recent federal case law cited herein as to*

*the standards of care required prior to the*

*issuance of a legally valid involuntary com-*

### mitment order under federal law;

plus all applicable costs to bring the lawsuit

herein by plaintiff. [NB:The punitive damage

upper limits as decided in the benchmark

federal case *State Farm Mutual Auto Ins.*

*Co. v. Campbell*(538 U.S.C. 408:2003)

has been applied to guide the punitive

damage award request, which applies the

"less than ten times the compensatory

award" standard to what it considered

allowable,*reduced by a single dollar* from the

calculation of ten times the compensatory

award thus rendering the request herein within

the guidelines for limits of same within the stan-

-47-

dard of the said benchmark *State Farm* ruling.].

DATED: *August 27,* _____, 2012

By: _____

[Plaintiff applying for/ proceeding *IFP]*

Under penalty of perjury, comes the above-signed

Plaintiff, a legal competent and indigent, averring

that all allegations rendered in the complaint herein

are true to the best of his knowledge and belief.

STATE OF NEW YORK

COUNTY OF ULSTER

ON THIS THE 2n+th DAY OF _August_, 20 12, BEFORE ME, KIMBERLEY A.
HARRELL, THE UNDERSIGNED OFFICER, PERSONALLY
APPEARED _Jeffrey A Kelley_, KNOWN TO ME (OR
SATISFACTORILY PROVEN TO BE THE PERSON(S) WHOSE NAME(S) (IS OR
ARE) SUBSCRIBED TO THE WITHIN INSTRUMENT AND ACKNOWLEDGED
THAT (HE, SHE OR THEY) EXECUTED THE SAME FOR THE PURPOSES
THEREIN CONTAINED.


IN WITNESS WHEREOF I HEREUNTO SET MY HAND.

_Kimberley A Harrell_

DATE COMMISSION EXPIRES:____10\6\2014____

# Social Security Administration

Date:  July 27, 2012
Claim Number:  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DI

1BEV010001315  0.345  MB  0.404      T00000006
JEFFREY ALLAN KELLY
164 COLONIAL DR
KINGSTON NY 12401-2212

You asked us for information from your record.  The information that you requested is shown below.  If you want anyone else to have this information, you may send them this letter.

## Information About Supplemental Security Income Payments

Beginning January 2012, the current Supplemental Security Income payment is $ 785.00.

This payment amount may change from month to month if income or living situation changes.

Supplemental Security Income Payments are paid the month they are due. (For example, Supplemental Security Income Payments for March are paid in March.)

## Type of Supplemental Security Income Payment Information

You are entitled to monthly payments as a disabled individual.

## If You Have Any Questions

If you have any questions, you may call us at 1-800-772-1213, or call your local Social Security office at 866-587-4419.  We can answer most questions over the phone.  You can also write or visit any Social Security office.  The office that serves your area is located at:

SOCIAL SECURITY
809 GRANT AVE
LAKE KATRINE, NY 12449

See Next Page



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DI

If you do call or visit an office, please have this letter with you.  It will help us answer your questions.

*Social Security Administration*



U.S. POSTAGE
PAID
KINGSTON, NY
12401
AUG 27 12
AMOUNT
$8.20
00084463-08

12207

1000

UNITED STATES
POSTAL SERVICE

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE
CERTIFIED MAIL™

7012 0470 0000 8070 3487

Mr. Jeffrey Kelly
164 Colonial Dr.
Kingston, NY 12401



Clerk, Federal District Court
N. District of NY
445 Broadway, Rm. 509
Albany, NY 12207

U.S. DISTRICT COURT
N.D. OF N.Y.
RECEIVED

AUG 2 9 2012

LAWRENCE K. BAERMAN, CLERK
ALBANY

